Filed 4/8/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RICARDO OMAR GONZALEZ et al., | D084738 |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2021-00022154-CU-BC-CTL) |
| v. | |
| COMMUNITY MORTUARY, INC., et al., | |
| Defendants and Respondents. | |

| | |
|---|---|
| CELINA GONZALEZ et al., | |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2022-00009892-CU-BC-CTL) |
| v. | |
| COMMUNITY MORTUARY, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge. Reversed in part and remanded with instructions.

McDougal Boehmer Foley Lyon Mitchell & Erickson, John E. Petze and Steven E. Boehmer for Plaintiffs and Appellants Ricardo Omar Gonzalez, Jose Carlos Gonzalez, Sr., Querubeck Selenna Gonzalez, Jasmin Karina Gonzalez and Isack Malaquias Gonzalez.

Sullivan, Rivera, Osuna & Sullivan and David C. Sullivan for Plaintiffs and Appellants Celina Gonzalez and Edna Tamara Gonzalez.

Gurnee Mason Rushford Bonotto & Forestiere, Steven H. Gurnee, John A. Mason and Candace H. Shirley for Defendants and Respondents.

INTRODUCTION

This appeal involves a tragic mistake by a Texas medical examiner's office that deprived a grieving San Diego family of their ability to bury a loved one. Because the medical examiner mixed up the bodies of two men who died a day apart, the family received the wrong body for burial, while the remains of their loved one were mistakenly cremated in Texas.

The widow, and other family members, sued the California mortuary they hired to prepare and transport their loved one's body to San Diego for funeral services for negligence and breach of contract. A jury found in favor of the mortuary on both causes of action. As to the contract claim, the mortuary asserted it was excused from performance based on the affirmative defense of impracticability of performance.[1] The defense was submitted to

_____

[1] As we shall explain, the defense of impracticability of performance has roots in the common law defense of impossibility of performance. It is sometimes still referred to using those terms, and this is how the parties here refer to the defense. It is also sometimes called the

2

the jury for final resolution, and it found the defense had been established. The family appeals, challenging only the jury's verdict on the contract claim.

We are asked to answer an open question in California: When a party asserts the affirmative defense of impracticability of performance in a breach of contract cause of action, is the defense properly submitted for decision to the judge or the jury? The answer depends on whether impracticability is a legal or equitable defense. As we will explain, the defense is equitable and is triable to a court, not a jury. We therefore agree with the family's first contention that the court erred when it submitted the defense to the jury for decision. As a remedy, we reverse the jury's verdict on the breach of contract cause of action and remand for a bench trial of the mortuary's affirmative defense, and if needed, a trial of damages on the breach of contract cause of action.

We disagree with the family's second claim of error that the trial court erred in granting the mortuary's motion for nonsuit on the ground that only the widow had standing to sue for breach of contract. The court correctly rejected the contention by other family members that they were intended third party beneficiaries to the contract. It therefore properly granted nonsuit because the extended family lacked standing to pursue damages for breach of contract.

BACKGROUND

I.

*Facts*

Jose Gonzalez, Jr. (Jose) died suddenly at the Baylor Scott & White Medical Center (Baylor) in Tarrant County, Texas, on March 20, 2020. He

---

"impossibility/impracticability" defense. For clarity and readability, we refer to the defense, as it stands today, as "impracticability of performance."

was a long-haul truck driver and was in Tarrant County when he died. Jose was survived by his wife Celina Gonzalez, his daughter Edna Tamara Gonzalez, and a large extended family that included his father Jose Carlos Gonzalez, Sr., brother Ricardo Omar Gonzalez, sister Querubeck Selenna Gonzalez, and two adult children from a previous marriage, Isack Malaquias Gonzalez and Jasmin Karina Gonzalez.[2]

A.    *The Texas Coroner Receives the Bodies of Jose Gonzalez Jr. and Jesse Gilbert Gonzales One Day Apart*

Following Jose's death, his body was taken to the Tarrant County Medical Examiner's Office (Coroner) where an autopsy was performed and his identity confirmed. The Coroner contracted with Accucare Mortuary Services, Inc. (Accucare) to pick up bodies from the place of death and deliver them to the Coroner's offices. Accucare's practice in taking possession of a body was to place a tag on the decedent's ankle with the name of the deceased if known, or "Unidentified" if not known, and the date it was called in for collection, and to put the remains in a body bag. At the Coroner's request, Accucare picked up Jose's body from Baylor and delivered it to the Coroner on March 20, 2020. When Jose's body arrived, the Coroner assigned his remains with case number 2005149. The case number was written on a white plastic tag then affixed to his ankle. Because Jose's identity had not yet been confirmed, the tag stated, "unidentified."

On March 21, 2020, one day after Jose had passed, Jesse Gilbert Gonzales (Jesse) died in Fort Worth, Texas. That day, Accucare picked up Jesse's body and transported it to the Coroner for identification and autopsy.

---

[2]    We will refer to all persons by their first name to avoid confusion; we mean no disrespect by using the familiar.

Accucare also placed a tag with "unidentified" on Jesse's ankle. When the body arrived at the Coroner, the Coroner assigned Jesse's remains with case number 2005194.

On March 22, 2020, at 12:17 p.m., an identification specialist employed by the Coroner positively identified Jose's body using his fingerprints. She printed a tag with Jose's name and case number. As was her practice, she placed the tag in a stack along with tags she had prepared for other remains identified that day. At 2:37 p.m., the identification specialist positively identified Jesse's body using his fingerprints. She printed a tag with Jesse's name and case number and put it in the same stack of other tags.

At the end of the day, the identification specialist went to affix the tags she had collected to the outside of the body bags held in the Coroner's refrigeration facility. It is possible she mixed up the tags for Jose and Jesse, and put Jesse's tag on Jose's body bag, and Jose's tag on Jesse's body bag.

B.    *The Texas Coroner Mistakenly Delivers Jose's Body to a Donor Program*

On March 23, 2020, Jesse's family authorized his body to be donated to the University of North Texas Health Science Center Willed Body Program (donor program). The donor program sent an employee to the Coroner's office to collect Jesse's body. The donor program employee presented a Coroner's release form which included Jesse's name and his case number (2005194) to facilitate the release. But a Coroner employee retrieved what he mistakenly believed to be Jesse's body and released it to the donor program, not knowing the body bag contained *Jose*'s body.

C.    *Celina Begins Making Funeral Arrangements for Jose*

Also on March 23, 2020, Celina contacted Community Mortuary, Inc. (Community) to make arrangements for her husband's remains to be returned home to Chula Vista, California. Community is a licensed funeral

5

establishment run by Robert Humphrey, the funeral director, and his wife, Dolores Humphrey, the funeral arranger and office manager. Dolores met with Celina to discuss the arrangements for Jose's body on behalf of Community.

Two days later, on March 25, 2020, Celina contracted with Community to take care of Jose's funeral services. Community agreed to "make all the arrangements to reach out to Texas to retrieve [Jose's] body from the [Coroner], have it embalmed, and then shipped to San Diego." Community also agreed to hold an open casket viewing at their mortuary for family and friends, and to bury Jose's body at a local cemetery following the viewing.

Community, in turn, contracted with another mortuary in Texas to retrieve Jose's body, embalm it, and return it to San Diego. The Texas mortuary arranged with Accucare to collect Jose's body from the Coroner and bring it to its establishment to be embalmed. Accucare was in possession of a release form prepared by the Texas mortuary that contained Jose's name and his Coroner case number (2005149).

D.     *The Texas Coroner Mistakenly Releases Jesse's Body to Community*

On March 26, 2020, a third Coroner employee mistakenly collected *Jesse*'s body from the refrigeration facility and released it to Accucare, believing it to be *Jose*'s body. But Jose's body was no longer at the Coroner's office, because it had erroneously been sent to the donor program three days earlier.

Accucare delivered Jesse's body to the Texas mortuary that had been retained by Community. After the Texas mortuary embalmed Jesse's body, it incinerated the body bag that had the Coroner's identification tag. Before transporting the body to San Diego, a body tag from the mortuary was placed on Jesse's ankle showing the name "Jose Carlos Gonzalez."

6

On March 27, 2020, Jesse's body was delivered to Community in Chula Vista and placed into storage. The Community employee who checked the body into storage believed he confirmed its identification by reviewing the shipping itinerary bearing Jose's name; the body transport permit issued by the State of Texas identifying the remains as Jose; an airline cargo bill of lading with Jose's name; and the Texas mortuary's tag on the ankle that had Jose's name on it. Based on the paperwork that accompanied the body, no one at Community discovered the mistake.

E.     *The Errors Are Discovered, but Too Late*

On April 17, 2020, Jose's body was cremated by the donor program.

On April 23, 2020, Community arranged an open casket viewing for Jose's family and friends, with the burial to follow at noon the next day. Community dressed what it believed to be Jose's body in the clothes provided by Celina and placed it in the casket Celina had selected. Celina, Edna, and another family member arrived at the chapel early and entered with the Community service director.

When the casket was opened, the family was horribly shocked to find it contained the wrong body. The service director, shocked herself, immediately went to notify Dolores and the employee who had checked the body in. After they showed the family all the paperwork that identified the body as Jose's, Dolores tried to explain to Celina that death can change a person's appearance. But after Edna explained her father had various tattoos on his body and it was confirmed there were no tattoos on the body in the casket, the casket was closed.

Community quickly learned the Coroner mistakenly sent Jose's body to the donor program, and that it had been cremated six days earlier. Jose's cremated remains were later sent to Community and retrieved by Celina on

7

May 6, 2020.  Community refunded to the family the cost of picking up, embalming, and transporting Jose's body from Texas.  It also bore the cost it incurred to ship Jesse's remains back to Texas and to procure the casket for Jose's funeral services.

## II.

### *The Family's Lawsuit*

Two lawsuits were filed.  In the first, the extended family members sued Community, Robert, Dolores, Accucare, the Texas mortuary, and several other businesses.  In the second lawsuit, Celina and Edna sued Community, Dolores and Robert.[3]  The two cases were then consolidated.

The operative complaint in the consolidated action filed in September 2022 alleged, relevant here, causes of action for breach of contract and negligence.[4]  In the operative answer, the defendants asserted the affirmative defense of impracticability with respect to the contract claim.

The case proceeded to jury trial in May 2024.  On the negligence claim, Celina, Edna, and the extended family (together, the Gonzalez family) advanced two theories of liability.

First, the Gonzalez family asserted Community was negligent because it should have investigated a "red flag" under the prevailing standard of care in the funeral business.  Evidence in support of this theory included

---

[3]     All claims against Robert in both lawsuits were dismissed, and he is not a party to this appeal.  Accucare, the Texas mortuary, and the other businesses sued by the extended family are also not parties to this appeal.

[4]     The operative complaint also alleged causes of action for breach of the implied covenant of good faith and fair dealing, fraud, intentional infliction of emotional distress, and a violation of Business & Professions Code section 17200.

testimony by a defense expert[5] that the standard of care in the funeral business requires that all mortuaries taking possession of human body remains, as well as every agent in the chain of custody, confirm the identity of the body from a "reliable source." A body identification tag from a medical examiner is considered a reliable source. And if a body is received from a medical examiner without a medical examiner tag, the absence is a "red flag" that requires further investigation to confirm the correct body has been received. But here, Jesse's body did not have a medical examiner tag when it was delivered to Community. It had a body tag prepared by the Texas mortuary, which had failed to catch the misidentification. Had Community investigated further, the Gonzalez family alleged, it would have discovered the misidentification before Jose's body was cremated. They pointed out, for example, that Community had in its possession photographs of Jose provided by Celina and it had also been informed he had a distinctive tattoo.

Dolores and Community countered this first theory of liability with evidence that the identification process followed by Community met the standard of care. Their funeral business expert opined there was no red flag because the body was not received *directly* from a medical examiner. Therefore, according to their expert, the Community employee who identified the body was entitled to rely on the paperwork that accompanied the body, all of which identified the remains as belonging to Jose. Specifically, it was reasonable to rely on the paperwork affixed to the shipping box, the burial and transit permit, which is generated by the State of Texas, and the body tag prepared by the Texas mortuary.

---

[5] The Gonzalez family relied on the defendants' expert for this testimony. They had designated an expert during discovery but did not call him as a witness.

There was also testimony that the body bag containing Jose's body was labelled as a suspected COVID-19 case. Several witnesses testified that during a "normal exchange" of a body, the body bag would be opened and the ankle tag checked for identity as an extra precaution against misidentification. But this practice was suspended during the early stages of the COVID-19 pandemic.

The Gonzalez family's second theory for negligence was that Celina went to Community twice to see Jose's body and Dolores allegedly—and unreasonably outside the prevailing standard of care—denied her request both times. Edna testified she made an appointment for Celina to see Jose's body on March 30, 2020, but when Celina arrived, Dolores refused her request. Celina testified that she went to the mortuary again a few days later and Dolores said she could not provide access.

Dolores denied Celina's allegation that she refused to allow her to see the body. She testified, "I do not ever remember them calling to request to see [Jose] or it would have happened. That's our protocol." Community's practice in response to a viewing request was to provide access immediately or, if the body was not presentable, to make an appointment. According to the funeral business expert, it is reasonable to require an advance appointment even after a body has been embalmed, because it may not be presentable for various reasons after it has been shipped. Dolores specifically denied that Celina asked to see the body when she visited the funeral establishment on March 30, 2020.

### III.

*Trial Proceedings*

After the close of evidence, Dolores and Community filed a motion for nonsuit pursuant to Code of Civil Procedure section 581c, subdivision (a),

based on two grounds.[6] First, they sought dismissal on the ground that the evidence, even when interpreted most favorably to the plaintiffs' case, required judgment as a matter of law in their favor on the affirmative defense of impracticability. The court denied the motion on this ground, but characterized the decision as a "very close call," saying, "I struggled with it."

Second, Dolores and Community contended Edna and the extended family did not have standing to pursue the breach of contract cause of action because they were not third parties to the contract. The court granted the motion, in part, on this ground.

Before the jury was instructed on the law, the parties disputed whether the affirmative defense of impracticability is properly tried to the judge or the jury. After hearing argument, the trial court submitted the question to the jury and instructed the jury as follows: "Impossibility or Impracticability [¶] A party is excused from performing a contract if in spite of exercising due diligence, it could not perform a contingency in the contract or could only perform that contingency with extreme and unreasonable difficulty, expense, or risk of injury or loss."[7]

---

[6] Further undesignated statutory references are to the Code of Civil Procedure.

[7] As we later discuss, the trial court's instruction to the jury omitted essential elements of the impracticability defense. The language in this instruction, however, has not been directly challenged on appeal. We disagree with counsel for the extended family members' oral argument assertion that the family properly raised this specific instructional error claim on appeal. In their opening brief on appeal, the extended family members claimed only that "the trial court committed reversible error when it gave the . . . instruction and allowed the jury to decide" the defense of impracticability. There was no error asserted based on the language of the

11

On May 24, 2024, the jury returned a verdict in favor of Dolores and Community on the negligence cause of action. On the contract cause of action, the jury found "full performance of all terms of the contract . . . excused due to impossibility or impracticability."

## DISCUSSION

### I.

*The Trial Court Erred When It Submitted the Defense of Impracticability of Performance to the Jury*

As noted, this appeal requires us to answer an open question in California: When a party asserts the affirmative defense of impracticability of performance in a breach of contract cause of action, is the defense properly submitted for decision to the judge or the jury? As we explain, to determine the answer to this question, we must first determine whether impracticability is a legal or equitable defense.[8] We conclude the defense is equitable. The trial court therefore erred when it submitted equitable issues and questions of law arising from the defense to the jury for decision. We reverse the jury's verdict on the breach of contract cause of action and remand with instructions for retrial of this cause only. Our review is de novo. (*Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 744.)

A.    *There Is No Right to a Jury Trial in California on the Defense of Impracticability of Performance*

Relying on section 592, Community and Dolores contend they were entitled to have their impracticability defense submitted to the jury for

---

instruction. Regardless, our conclusion the court erred by submitting the impracticability defense to the jury renders any such contention moot.

[8]    The parties did not identify this issue as determinative, and so, we allowed them to submit supplemental briefing.

decision. They are mistaken. Section 592 sets forth the basic principle that, in a breach of contract *action* seeking damages, questions of law are first decided by the court and issues of fact are then tried to the jury, unless trial by jury is waived. But the question here is, which decision maker adjudicates the *affirmative defense* of impracticability? We conclude there is no constitutional right to a jury trial of the defense.

  1.  *The Constitutional Right to Trial by Jury in Civil Cases*

  Article I, section 16 of the California Constitution provides that "[t]rial by jury is an inviolate right and shall be secured to all." "From the outset of our state's history, our courts have explained that this provision was intended to *preserve* the right to a civil jury as it existed at common law in 1850 when the jury trial provision was first incorporated into the California Constitution." (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 315 (*Nationwide*).) "[W]hat that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact." (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 287 (*Chevrolet Coupe*).)

  "Historically, there were separate law and equity courts. . . . The law courts dealt with ordinary property rights, debts, and trespasses and adjudicated disputes by live testimony before a lay jury. . . . The equity courts dealt with ethical matters and adjudicated disputes by written testimony before a judge. . . . The separate law and equity courts were merged, but the distinction between law and equity remains to this day. The right to a jury trial for civil actions is generally limited to those causes of action (and their analogues) that were historically triable in a court of law." (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155, citations omitted (*Hoopes*).) The same holds true for affirmative defenses. (See *Bank of*

*America Nat. Trust & Sav. Assn v. Lamb Finance Co.* (1956) 145 Cal.App.2d 702, 706 (*Bank of America*).)

"Complications arise when legal and equitable issues (causes of action, requested remedies, or defenses) are asserted in a single lawsuit." (*Hoopes, supra,* 168 Cal.App.4th at p. 156.) In such instances, to the extent possible, equitable and legal issues are "kept distinct and separate." (*Weber v. Marshall* (1861) 19 Cal. 447, 457 (*Weber*).) The parties are "entitled to have the equitable issues tried by the court without a jury, and . . . the legal issues submitted to a jury." (*Thomson v. Thomson* (1936) 7 Cal.2d 671, 681 (*Thomson*).)

But if the legal and equitable aspects of a cause of action cannot be severed, the right to a jury trial then depends on "the gist of the action," which is determined based on "the nature of the rights involved and the facts of the particular case." (*Chevrolet Coupe, supra,* 37 Cal.2d at p. 299.) The gist-of-the-action test also applies when classifying actions that had " 'no counterpart in English law.' " (*Nationwide, supra,* 9 Cal.5th at p. 319; see *id.* at pp. 318–320, 324.) When considering whether an action (or a defense) is equitable or legal under this standard, courts look at the nature of the relief sought and whether adjudication requires the weighing or balancing of equitable principles and considerations in a manner that is not amenable to assessment by a lay jury. (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9–11 (*C & K Engineering*) [actions]; see *Bank of America, supra,* 145 Cal.App.2d at pp. 706–707 [defenses].)

Important here, "when severable legal and equitable causes of action or issues are present in a single proceeding, the trial court generally has authority to determine in what order the matters should be heard." (*Nationwide, supra,* 9 Cal.5th at p. 317.) "[A]lthough a trial court retains

14

discretion regarding the order in which the issues should be tried, the governing California cases express a preference that the equitable issues be tried first." (*Ibid*.)  This is because of the practice followed by the courts of law and chancery in England.  (*Liberty Oil Co. v. Condon Nat. Bank* (1922) 260 U.S. 235, 243.)  "If a defendant at law had an equitable defense, he resorted to a bill in equity to enjoin the suit at law, until he could make his equitable defense effective by a hearing before the chancellor.  The hearing on that bill was before the chancellor, and not before a jury, and if the prayer of the bill was granted, the injunction against the suit at law was made perpetual, and no jury trial ensued.  If the injunction was denied, the suit at law proceeded to verdict and judgment." (*Ibid*.)  "This general 'equity first preference' is a long standing feature of California law and has always been viewed as fully compatible with the right to jury trial embodied in the California Constitution." (*Nationwide,* at p. 317.)

Applying these principles here, there is no question the cause of action for breach of contract was properly tried to the jury, with questions of law, such as contract language interpretation, determined by the court.  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1128.)  At early common law, a breach of contract action was triable in a court of law.  (E.g., *Nationwide, supra*, 9 Cal.5th at p. 293.)  Accordingly, "a suit to recover damages for . . . breach of contract is an action at law in which a right to jury trial ordinarily exists." (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671.)  The parties do not contend otherwise.

By contrast, whether the impracticability defense is properly tried to a judge or a jury is an open question that has brought the parties into stark disagreement.  In accordance with the settled law we have discussed, we decide this question based on consideration of the historical development of

15

the defense, the nature of the relief sought, and whether the substantive elements to be adjudicated require the consideration and application of equitable principles not suitable for assessment by a jury. (*C & K Engineering, supra*, 23 Cal.3d at pp. 9–11.)

2. *Historical Background*

The defense of impracticality of performance, as it stands today, is articulated in the Restatement (Second) of Contracts as follows: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." (Rest.2d Contracts, § 261.)

When California joined the United States in 1850, the defense did not exist. The English courts of law recognized a precursor doctrine, "impossibility of performance," as a basis for excusing a breach of contract. (*Opera Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts* (4th Cir. 1987) 817 F.2d 1094, 1097, 1099–1100 (*Opera*)).[9] But this defense, as it existed in early England, was extraordinarily narrow. This was the era of an avowed commitment by the courts to "the principle of sanctity of contracts." (*Id.* at p. 1097.) The defense was applied sparingly, in a rigid and absolutist framework where a party was almost always "bound to do whatever was necessary to its performance." (*Dermott v. Jones* (1865) 69 U.S. 1, 7 & fn. 7 (*Dermott*) [collecting cases including *Paradine v. Jane* (K.B. 1647) 82 Eng. Rep. 897 [rent must be paid despite occupation of the premises by a "hostile

---

[9] We have drawn heavily throughout our opinion on the detailed historical research and excellent analysis conducted by the Fourth Circuit in the *Opera* decision.

16

army"].)  The impossibility defense was unavailable unless performance was an *absolute* impossibility.  (*Opera*, at p. 1099.)  It was also limited to a few, narrow and highly specific circumstances.  (*Dermott*, at p. 8.)

As the United States Supreme Court has explained, the impossibility defense was a "a well-settled rule of law, that if a party by his contract charge[s] himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party.  Unforeseen difficulties, however great, will not excuse him." (*Dermott, supra*, 69 U.S. at p. 7.)  The rule required "parties to do what they have agreed to do.  If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it.  If the parties have made no provision for a dispensation, the rule of law gives none.  It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated." (*Id.* at p. 8.)

Nor was the defense available in equity.  After surveying early English case law, the Supreme Court explained, "A company agreed to build a bridge in a substantial manner, and to keep it in repair for a certain time.  A flood carried it away.  It was held that the company was bound to rebuild.  A person contracted to build a house upon the land of another.  Before it was completed it was destroyed by fire.  It was held that he was not thereby excused from the performance of his contract.  A party contracted to erect and complete a building on a certain lot.  By reason of a latent defect in soil the building fell down before it was completed.  It was held . . . that the loss must be borne by the contractor. . . .  Under such circumstances equity cannot interpose." (*Dermott, supra*, 69 U.S. at p. 8, fns. omitted.)

17

In 1863, 13 years after California's admission to the Union, the English court system relaxed the principle of "the sanctity of contracts" to the extent it had constrained the recognition of additional circumstances when performance under a contract could be excused on the ground of impossibility. (*Opera*, *supra*, 817 F.2d at p. 1097.) In *Taylor v. Caldwell* (Q.B. 1863) 122 Eng. Rep. 309, an appellate court at law concluded that the impossibility defense could successfully be raised in cases where an essential subject of the contract, necessary to performance, was unexpectedly destroyed. The court justified the expansion of the impossibility doctrine based on principles of contract interpretation, conceptualizing the defense as "an implied condition arising without express condition in the contract itself." (*Opera*, at p. 1097.) As explained in *Taylor*, "[I]n contracts in which the performance depends on the continued existence of a given person or thing, a condition is implied that the impossibility of performance arising from the perishing of the person or thing shall excuse the performance. [¶] In none of these cases is the promise in words other than positive, nor is there any express stipulation that the destruction of the person or thing shall excuse the performance; but that excuse is by law implied, because from the nature of the contract it is apparent that the parties contracted on the basis of the continued existence of the particular person or chattel." (*Taylor*, at p. 314.)

The California Supreme Court adopted the rule promulgated in *Taylor*, along with its implied-term rationale, at the turn of the 20th century. (See *Ontario Deciduous Fruit Growers' Assn. v. Cutting Fruit Packing Co.* (1901) 134 Cal. 21, 24.) But shortly thereafter, in 1916, our high court followed a developing trend toward excusing contract performance under even broader circumstances.

In *Mineral Park Land Co. v. Howard* (1916) 172 Cal. 289 (*Mineral Park*), the defendants contracted to remove a set amount of gravel from the plaintiff's land at a set price, but later determined that some of the gravel, although present, unexpectedly lay below the water table. (*Id.* at pp. 290–291.) The gravel that was underwater could not be extracted without the use of a steam-dredger, and if extracted, could not be used "without first having been dried at great expense and delay" at more than "ten or twelve times as much as the usual cost." (*Id.* at p. 291.)

Under these circumstances, the California Supreme Court excused further performance by the defendants because the parties had made an assumption that turned out to be incorrect and which rendered full performance unreasonable. The parties had "contemplated and assumed that the land contained the requisite quantity [of gravel], available for use," but "[t]o all fair intents . . . , it was impossible for [them] to take it." (*Mineral Park*, *supra*, 172 Cal. at p. 293.) The court held the defendants were excused because " '[a] thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' " (*Ibid.*) The court explained, "in determining whether the earth and gravel were 'available,' we must view the conditions in a practical and reasonable way. Although there was gravel on the land, it was so situated that the defendants could not take it by ordinary means, nor except at a prohibitive cost." (*Ibid.*)

Importantly, our high court clarified, "We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation more expensive than they had anticipated, or which would entail a loss upon them. But where the difference in cost is so great as here, and has the effect, as

19

found, of making performance impracticable, the situation is not different from that of a total [impossibility]." (*Mineral Park, supra,* 172 Cal. at p. 293; see also Rest.2d Contracts, § 261, com. d [" 'impracticability' means more than 'impracticality' "].)

The modern doctrine of impracticability is founded on principles of fundamental fairness, not the contract-interpretation theory that underlay the English court's decision in *Taylor*. (*Transatlantic Financing Corp. v. United States* (D.C. Cir. 1966) 363 F.2d 312, 315.) The Restatement (Second) of Contracts explains, "An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable." (Rest.2d Contracts, ch. 11, Introductory Note.) As explained in the Restatement, the rationale for the doctrine, as it has been expanded, is that "the obligor is relieved of his duty because the contract, having been made on a different 'basic assumption,' is regarded as not covering the case that has arisen . . . falling within a 'gap' in the contract." (*Ibid.*) Thus, "[w]hen the [defense] is raised, the court is asked to construct a condition of performance based on the changed circumstances." (*Transatlantic,* at p. 315, fn. omitted.) This expansion of the doctrine "ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance." (*Ibid.*)

3. *Elements and Relief Available*

Today, a party relying on the defense of impracticability of performance must establish (1) the occurrence of an event that makes performance impossible or impracticable (*Mineral Park, supra*, 172 Cal. at p. 293), (2) the event occurred through no fault of the party seeking relief (*Majestic Asset Management LLC v. The Colony at California Oaks Homeowners Assn.* (2024) 107 Cal.App.5th 413, 428), (3) the event was unexpected in the sense that its non-occurrence was a basic assumption of the agreement of the parties (*Autry v. Republic Productions, Inc.* (1947) 30 Cal.2d 144, 149 (*Autry*)), and (4) the language of the contract or the circumstances warrant a reallocation of the risk of impracticability to another party (*City of Vernon v. City of Los Angeles* (1955) 45 Cal.2d 710, 719–721 (*City of Vernon*)). (See generally, Rest.2d Contracts, § 261, coms. a–d.)

If the defense is established, the trial court is then empowered "to do substantial justice" by choosing from several remedies. (Rest.2d Contracts, ch. 11, Introductory Note.) The court may discharge the obligor and leave the parties where they find themselves. (*Farnon v. Cole* (1968) 259 Cal.App.2d 855, 857.) It may award restitution or expenses incurred in reliance on the contract. (*In re Univ. of S. Cal. Tuition and Feed COVID-19 Refund Litigation* (C.D. Cal. 2023) 695 F.Supp.3d 1128, 1144.) It may permit recovery for partial services rendered in quantum meruit. (*Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 285.) It may also fill the gap in the contract by adjusting the obligations of the parties. (*City of Vernon, supra*, 45 Cal.2d at p. 721.)

4. *The Gist of the Defense of Impracticability of Performance*

Having considered the historical development, elements, and available remedies for the defense of impracticability of performance, we conclude it

21

sounds in equity and carries no right to trial by jury. Starting with historical precedent, there is no basis in common law history that establishes a right to a jury trial on the impracticability defense. As we have recounted, when California achieved statehood in 1850, the defense of impracticability of performance was not available in English courts, neither at law nor in equity. Although the defense of impossibility of performance was available, it was limited to situations where performance was made literally impossible by an "act of God, the law, or the other party." (*Dermott*, *supra*, 69 U.S. at p. 7.) Community and Dolores have asserted no such defense here.[10] They contend that an essential subject matter of their contract was destroyed by a third party through no fault of their own. The expansion of the impossibility defense to include such situations was not recognized in the English court system until 1863. (*Opera*, *supra*, 817 F.2d at p. 1097.)

Because the impracticability defense has no historical counterpart in English law prior to 1850, the question then becomes whether the gist of the impracticability defense is legal or equitable. (*Nationwide*, *supra*, 9 Cal.5th at pp. 318–320, 323–324.) Based on the standards that must be applied to assess the elements of the defense, and the available remedies, we are persuaded that the fundamental nature of the defense, in its current form, is equitable for three reasons.

---

[10] It may be the case that parties to a breach of contract action have a right to a jury trial on a defendant's impracticability defense if the factual basis alleged in support tracks the elements of the defense of impossibility of performance as it existed in England before 1850, i.e., if the defendant alleges that performance is literally impossible due to an act of God, a change in the law, or the actions of another party. This question is not before us, however, nor is it necessary to our decision.

First, two of the elements that must be proven require the assessment of competing equitable considerations that juries are not equipped to weigh and evaluate effectively. To determine (1) whether the non-occurrence of a particular event was a basic assumption of the agreement of the parties, and (2) whether the language of the contract or the circumstances warrant a reallocation of the risk, the decision-maker must assess a wide range of circumstances and exercise "judgment as to which party assumed the risk of [the event's] occurrence." (Rest.2d Contracts, ch. 11, Introductory Note.) Factors to be considered include whether the event was unforeseeable, "the relative bargaining positions of the parties," and "the relative ease with which either party could have included a clause [in the contract]" that allocated the risk of the event's occurrence. (*Ibid*.) Other examples of considerations that may come into play include whether industry practice expects a party to "insure or otherwise secure himself against a risk," and "the practical difficulty of reaching agreement on the myriad of conceivable terms of a complex agreement . . . to deal with improbable contingencies." (Rest.2d Contracts, § 261, com. c.)

Second, as noted, the decision-maker must ultimately "determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable." (Rest.2d Contracts, ch. 11, Introductory Note.) "Determining what is unfair calls on [a decision-maker] to exercise the sort of flexible discretion that characterized the courts of equity—a kind of judgment that juries have not historically made, nor are well suited to make." (*Nationwide*, *supra*, 9 Cal.5th at p. 336 (conc. opn. of Kruger, J.).)

Finally, the remedies that are available if the defense is proven are largely equitable. As discussed, if the defense is established, the decision-

23

maker may select appropriate relief at its discretion from a wide range of options, including the adjustment of the parties' rights and obligations under the contract, so as to achieve "substantial justice." (Rest.2d Contracts, ch. 11, Introductory Note.) Under these circumstances, it is generally "an impossible task for a jury to determine the appropriate relief and to resolve the rights, equities, and interests of all of the parties." (*Southern Pac. Transportation Co. v. Superior Court* (1976) 58 Cal.App.3d 433, 438.)

Relying on *Mitchell v. Ceazan Tires* (1944) 25 Cal.2d 45, 48 (*Mitchell*), the Gonzalez family contends the defense of impracticability is not an equitable defense and sounds rather in law, with the ultimate ruling a question of law to be decided by the court. We are not persuaded. In *Mitchell*, the court addressed whether performance under a lease became literally impossible when the federal government issued an order during World War II that restricted the sale of automobile tires. (*Id.* at p. 46.) After reviewing the relevant regulations, the court concluded, "Since the sale of new and used tires remains lawful although on a restricted basis, no question of illegality or impossibility arises." (*Id.* at p. 47.) In this context—where the court was called upon to decide a pure question of law by interpreting government regulations and the language used in the four corners of a written lease—the court stated that "impossibility[ ] is a conclusion of law drawn by the court from the facts of a given case." (*Id.* at p. 48.) This statement by the court addressed the standard of review when an issue that presents a pure question of law has been decided by the trial court. It did not address the nature of the impracticability defense, whether legal or equitable, which is an entirely distinct question.[11]

---

11    The fact pattern in *Mitchell* also closely tracks the elements of the defense of impossibility of performance as it existed in England before 1850.

For the reasons stated, we conclude impracticability of performance is an equitable defense, both functionally and historically. Dolores and Community did not have a constitutional right to have the defense submitted to the jury.

B.    *It Was Error to Submit an Equitable Defense to the Jury for Decision*

Dolores and Community contend that, even if they had no constitutional right to a jury trial, the trial court had broad discretion to submit the impracticability defense to the jury for decision. In support, they cite *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612 (*Unilogic*). *Unilogic* held that trial courts have discretion to submit an equitable defense to the jury when the factual theories that support the defense are "intertwined" with the opposing parties' legal cause of action. (*Id.* at p. 623; see *id.* at pp. 622–623.)

Based on our understanding of the case law, it was long-ago settled under California Supreme Court holdings that trial court judges are required to decide equitable causes of action and defenses (*Thomson, supra,* 7 Cal.2d at pp. 678–682 [causes of action]; see *Arguello v. Edinger* (1858) 10 Cal. 150, 158–160 [defenses]), although courts may seek *assistance* from an *advisory* jury to resolve *factual* issues that underlie a decision or a ruling involving equitable issues (*Weber, supra*, 19 Cal. at pp. 457–458). And in actions involving both legal and equitable issues, the parties are "entitled to have the

_____

The defendant in *Mitchell* alleged that its performance was literally impossible due to a change in the law. (*Mitchell*, *supra*, 25 Cal.2d at pp. 46–47.) As we have previously explained, see footnote 10, *ante*, there may be a right to a jury trial in such cases, with a judge, as always, deciding pure questions of law that arise from the specific factual dispute. But here, Community and Dolores do not contend a change in the law prevented their performance.

25

equitable issues tried by the court without a jury," and "the legal issues submitted to a jury." (*Thomson,* at p. 681.)

In such cases, "[i]t is beyond dispute that where both legal and equitable issues are present, a jury may be empaneled to try the legal issues, and may also at the court's discretion be asked for *advisory verdicts* as to facts which may apply to the equitable issues." (*A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 473, italics added (*A-C Co.*).) But "[i]t is equally beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper." (*Id.* at p. 474.) As our high court explained in 1907, "if a jury be called in[,] it simply acts in an advisory capacity, the court being compelled to make findings of its own." (*De Arellanes v. Arellanes* (1907) 151 Cal. 443, 449.)

Against this backdrop of settled authority, the court of appeal in *Unilogic* concluded that trial court judges have discretion to submit equitable defenses to a jury for decision on a non-advisory basis. (*Unilogic, supra,* 10 Cal.App.4th at pp. 616, 618, 621–623.) In *Unilogic,* the defendant raised the defense of unclean hands in response to the plaintiff's legal cause of action for conversion, and the trial court submitted the entire equitable defense to the jury for decision, as opposed to seeking assistance with the resolution of factual issues on an advisory basis. (*Id.* at pp. 617, 621.) The defendant appealed and claimed this was error. (*Id.* at p. 618.) Relying on *Weber, supra,* 19 Cal. 447, the court held "the trial court has discretion whether to submit an equitable defense to the jury" when the equitable issues required to resolve the defense are intertwined with legal issues that relate to legal claims triable to a jury. (*Unilogic,* at pp. 622–623.)

26

But we do not read *Weber* to provide support for *Unilogic's* holding.  In *Weber,* the plaintiff sued the defendant to eject him from a tract of land on a theory cognizable at law.  (*Weber*, *supra*, 19 Cal. at p. 457.)  At trial, the judge submitted all the defendant's defenses, both legal and equitable, to the jury for decision.  (*Ibid.*)  Our high court held, "This was irregular."  (*Ibid.*)  The court explained the correct procedure under the circumstances was for the trial court judge to decide the equitable defense, and if it presented no ground for relief, to submit the remaining legal issues to a jury.  (*Ibid.*)

The *Weber* court then discussed the trial court judge's discretion to submit "an issue or issues to a jury" to "*aid*" and "*assist* him in sifting and ascertaining *the facts*."  (*Weber*, *supra*, 19 Cal. at pp. 457–458, italics added.)  In our view, considering our high court's later holdings (e.g., *Thomson*, *supra*, 7 Cal.2d 671) and its complete statement in *Weber*, it is clear the court was addressing the submission of factual issues to the jury for an advisory verdict, not countenancing the submission of an entire equitable defense to a jury for decision.  The court said, "The parties are entitled to a trial by jury upon the legal issues; but the [c]ourt, sitting to administer equitable relief, either by way of defense to an action of ejectment, or affirmatively, sits as a chancellor, and in the exercise of equitable powers, may or may not order an issue or issues to a jury in its discretion; but in a great majority of cases the [j]udge can as well pass upon the facts as a jury, and may do so with a great deal less delay and expense.  It is only when the evidence is very contradictory, and the question turns on the relative credibility of witnesses, or in such exceptional instances that the chancellor calls in the aid of a jury to assist him in sifting and ascertaining the facts."  (*Weber*, at pp. 457–458.)

27

*Weber* therefore does not support *Unilogic's* holding that trial courts have discretion to submit equitable defenses to a jury on a non-advisory basis.

The trial court here accordingly erred when it submitted Community and Dolores's impracticability defense to the jury over the Gonzalez family's objection. The court had discretion to seek assistance from the jury in deciding questions of fact that needed to be resolved to determine whether the elements of the impracticability defense had been satisfied. But "[i]t is . . . beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper," which did not happen here. (*A-C Co.*, *supra*, 173 Cal.App.3d at p. 474.)

It was error, too, for the trial court to instruct the jury to determine the proper interpretation of contract provisions to the extent they were in writing.[12] As noted, the court here instructed the jury as follows: "Impossibility or Impracticability [¶] A party is excused from performing a contract if in spite of exercising due diligence, it could not perform a contingency in the contract or could only perform that contingency with extreme and unreasonable difficulty, expense, or risk of injury or loss." Although "[j]uries are not prohibited from interpreting contracts," the "[i]nterpretation of a written instrument becomes solely a judicial function . . . when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence." (*City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.)

---

[12] The contract here had both oral and written components.

28

The trial court also did not have discretion to delegate the ultimate decision as to whether justice and fairness required a departure from the agreed-upon terms of the contract because performance had been rendered impracticable.  It thus additionally erred by instructing the jury to make this decision.  (*De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 505.)  "The tradition and heredity of the flexible equitable powers of the modern trial judge derive from the role of the trained and experienced chancellor and depend upon skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission through instructions to a lay jury."  (*A-C Co.*, *supra*, 173 Cal.App.3d at p. 473.)

C.     *Remand Is Required*

Had the trial court erred merely by submitting a question of law to the jury, we would be required to conduct a harmless error analysis to determine whether remand is warranted.  (§ 475; Cal. Const., art. VI, § 13.)  But here, the court submitted an entire equitable defense, including the ultimate ruling, to the jury.  The parties disagree as to whether remand is automatic or warranted only after review for review for harmless error.

The Gonzalez family contends this is the type of decision-maker error that requires reversal per se.  (See *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 261 ["The remedy when an issue has erroneously been addressed by a court rather than an arbitrator is to remand with instructions that the correct decision maker consider the issue anew"].)  As another possible ground for automatic reversal, we observe there is authority that holds the failure to make a discretionary decision vested in the court by law is reversible per se.  (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [" 'Failure to exercise a discretion conferred and compelled by law

29

constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal' "].)

Relying on *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383 (*Beasley*), Dolores and Community contend the error is not reversible per se and we are required to conduct a harmless error analysis. The court in *Beasley* held, "The erroneous grant of a jury trial or the improper submission of an issue to the jury is nothing more than a nonconstitutional procedural error." (*Id.* at p. 1396.)

We do not need to resolve this question today because we conclude that reversal under traditional harmless error standard is required. Under that standard, the party seeking reversal must show a miscarriage of justice. (*Beasley*, *supra*, 235 Cal.App.3d at p. 1396; § 475; Cal. Const., art. VI, § 13). " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co*. (1984) 36 Cal.3d 752, 770.)

As a preliminary matter, the jury's verdict on the impracticability defense is unhelpful to our assessment of the reasonable probabilities because the trial court's instruction to the jury omitted essential elements of the impracticability defense. The court instructed the jury that "[a] party is excused from performing a contract if in spite of exercising due diligence, it could not perform a contingency in the contract or could only perform that contingency with extreme and unreasonable difficulty, expense, or risk of injury or loss." But to prove impracticability of performance, Dolores and Community were also required to prove that the event was unexpected and

30

the language of the contract or the circumstances warranted a reallocation of the risk of impracticability to another party. (*Autry, supra,* 30 Cal.2d at p. 149; *City of Vernon, supra,* 45 Cal.2d at pp. 719–721.) Without proper instruction on these two elements, we conclude the jury's verdict is entitled to no weight as we conduct our analysis, even on an advisory basis.

Turning to the first two elements, the parties do not meaningfully dispute that the first element—the occurrence of an event that makes performance impossible or impracticable—has clearly been satisfied by the tragic circumstances. As for the second element, based on the jury's verdict in favor of Dolores and Community on the negligence cause of action, it is at least reasonably probable the trial court would have also found that Dolores and Community's inability to perform was not their fault.[13]

Turning to the third and fourth elements, many factors come into play when considering whether an event was unexpected and whether and how a contract has allocated risks. As noted, the factors include, but are not limited to, "the relative bargaining positions of the parties," "the relative ease with which either party could have included a clause [in the contract]" (Rest.2d Contracts, ch. 11, Introductory Note) that allocated the risk of the event's occurrence, whether industry practice expects a party "to insure or otherwise secure himself against a risk," and "the practical difficulty of reaching agreement on the myriad of conceivable terms of a complex agreement . . . to deal with improbable contingencies" (Rest.2d Contracts, § 261, com. c).

Considering these factors, the evidence from Dolores and Community's own expert permits an inference that a misidentification of the sort that

_____

13    As we later explain, the trial court may be bound on remand by this finding.

31

occurred here is not unexpected in the sense that its non-occurrence was a basic assumption of the agreement of the parties. Based on this expert testimony, funeral homes are keenly aware of the potential for a person's remains to be misidentified and that contracting parties may suffer severe emotional distress as a result. In response, the industry has adopted standards and protocols to guard heavily against the possibility of a mix-up, and the standard of care and industry protocol is that every agent in the chain of custody must confirm the identity of the body based on a reliable source. The law also uniquely allows for emotional distress damages for breach of contract in this regard. (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 890–891 (*Christensen*).)

On the other hand, the arrival of COVID-19 to Texas and California in March 2020 was indisputably unexpected, and there was testimony that procedures and practices that were in place to guard against misidentification had to be changed—abruptly—due to the global pandemic. There was also testimony that an identification tag from a coroner's office is considered a reliable source of identification that obviates the need for further investigation, the implication being that a mix-up by a coroner may not be something that can reasonably be guarded against or considered to be an allocated risk of doing business in the funeral services industry.

Given there is evidence that appears highly favorable to both parties with respect to the third and fourth elements of the impracticability defense, we cannot say one way or another which party was more likely to have prevailed had the trial court properly rendered a decision on all elements of the defense. A reasonable probability of success appears to have been in play for both sides.

32

D.    *Directions and Guidance on Remand*

On remand, the trial court is directed to independently decide the merits of Dolores and Community's impracticability defense.  In making its determination, the court may rely on the evidence presented at the original trial or receive additional evidence as it deems necessary or advisable. (*England v. Christensen* (1966) 243 Cal.App.2d 413, 435.)  If Dolores and Community fail to sustain their burden of proof, there is no need to retry the breach of contract cause of action in its entirety.  That is because the jury found Community failed to perform "all the obligations the contract required it to perform."  If Dolores and Community do not prevail on their equitable defense, the court is directed to try the question of damages on the breach of contract cause of action, and to submit the question to a jury at the request of either party.

For guidance on remand, we note that, while the jury's findings with respect to the impracticability defense are advisory in nature, any express or implied findings of fact by the jury *with respect to the negligence cause of action* are binding on the trial court's decision if the trial court chooses to adjudicate Dolores and Community's impracticability defense without receiving further evidence.  "[A]djudicated issues in earlier phases of a bifurcated trial are binding in later phases of trial." (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 488; see *id.* at p. 487.)  "[T]he first factfinder binds the second on common issues of fact." (*Hoopes, supra,* 168 Cal.App.4th at p. 158.)  This principle holds both when a court determines issues before a jury, and vice versa. (*Arntz,* at p. 487.)  "A jury is not 'a mere advisory body' in deciding legal causes of action." (*Hoopes,* at p. 156.)

33

For all these reasons, we reverse the judgment on the contract cause of action and remand to the trial court for additional proceedings.

## II.

*Edna and the Extended Family Lack Standing To Sue for Breach of Contract*

As noted, the trial court granted in part a motion for nonsuit filed by Dolores and Community on the ground that Edna and the extended family did not have standing to pursue the breach of contract cause of action because they were not third party beneficiaries to the contract. Edna and the extended family contend this was error. We are not persuaded.

Our review is de novo. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060.) As we conduct our independent review, we consider the evidence in the light most favorable to the plaintiffs, and we will uphold the grant of a motion for nonsuit only if we determine the evidence presented was insufficient to permit a jury to find in their favor as a matter of law. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

"From the beginning of the 20th century, virtually all American courts applying common law contract principles have recognized that it is appropriate *under some circumstances* to permit an individual or entity that is not a party to a contract to bring an action to enforce the contract." (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 828 (*Goonewardene*).) "Courts have struggled, however, to formulate useful, general principles to identify those circumstances in which a third party should be permitted to maintain an action for an alleged breach of a contract to which it is not a contracting party, as distinguished from the usual instance in which only the contracting parties may bring an action under the contract." (*Ibid.*)

Our high court recently clarified that, "under California's third party beneficiary doctrine, a third party—that is, an individual or entity that is not a party to a contract—may bring a breach of contract action against a party to a contract only if the third party establishes not only (1) that it is likely to benefit from the contract, but also (2) that a motivating purpose of the contracting parties is to provide a benefit to the third party, and further (3) that permitting the third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Goonewardene, supra*, 6 Cal.5th at p. 821.)  With respect to the third element in particular, our Supreme Court explains that it "calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals, rather than a determination whether the parties actually anticipated third party enforcement at the time the contract was entered into." (*Id.* at p. 831.)  Thus, even if a motivating purpose of the contracting parties is to provide a benefit to a group of third parties, that purpose "still may be inconsistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Id.* at p. 836.)

Applying these principles, we assume, without deciding, that one motivating purpose of the contract between Celina and the defendants was to provide a valuable benefit to Jose's friends and family in the form of funeral services and a space where they could grieve for him and say goodbye. Directing our attention to the third element, we conclude that Edna and the extended family cannot establish that permitting them to bring a lawsuit to enforce an alleged breach by Community and Dolores of their obligations under their contract with Celina is reasonably consistent with the expectations of the contracting parties.

35

Our conclusion is based, in part, on the unique nature of the contract between Celina and the defendants. "[I]n the context of an action for breach of contract, where recovery of damages solely for emotional distress resulting from a breach is not normally allowed, the provision of services related to the disposition of human remains has been distinguished because of the unique nature of the services." (*Christensen, supra,* 54 Cal.3d at pp. 894–895.) Because these kinds of contracts are ones "which so affect the vital concerns of the individual that severe mental distress is a foreseeable result of [a] breach[,] . . . our courts have recognized that damages for mental distress may be recovered for breach of a contract of this nature." (*Allen v. Jones* (1980) 104 Cal.App.3d 207, 211.)

Significantly, our case law also recognizes "that mortuary services are performed for the benefit of family members other than the contracting party or holder of the [Health & Safety Code section 7100] statutory right." (*Christensen, supra*, 54 Cal.3d at p. 887.) It holds that a contract to provide funeral-related services creates a special relationship between the provider and close family members of the decedent that permits recovery in negligence for severe emotional distress for a "breach of a duty arising out of a third party contract" when the services are not performed "in the dignified and respectful manner the bereaved expect of mortuary and crematory operators." (*Id.* at p. 891.) "Once a mortuary . . . undertakes to accept the care, custody and control of the remains, a duty of care must be found running to the members of decedent's bereaved family." (*Draper Mortuary v. Superior Court* (1982) 135 Cal.App.3d 533, 538.) Close family members who may seek damages under this theory of recovery are limited to those "who were aware that funeral and/or crematory services were being performed, and on whose behalf or for whose benefit the services were rendered." (*Christensen,* at

36

pp. 875, 896.) Edna and the extended family's cause of action in negligence was founded on this theory of recovery.

We are aware of only one decision to directly address whether non-parties to a contract for funeral services may sue a mortuary or other provider for breach of contract on a third party beneficiary theory. In *Cohen v. Groman Mortuary, Inc.* (1964) 231 Cal.App.2d 1, disapproved on other grounds by *Christensen, supra*, 54 Cal.3d at page 889, the court of appeal held that the sister and brother of the deceased were barred from recovery because they were neither parties to the contract nor a person with the right to control the disposition of the remains of the deceased pursuant to Health & Safety Code section 7100. (*Cohen,* at pp. 3–4, 7–8.) *Cohen* does not contain an extended discussion on this topic.

Our high court disapproved *Cohen* on other grounds but left the contract-related aspect of its holding in place. (See *Christensen*, *supra*, 54 Cal.3d. at pp. 888–889; see also *Quesada v. Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596, 601 [criticizing *Cohen* on other grounds as well].) The court acknowledged this aspect of the holding as follows: "[*Cohen*] concluded that a [Health & Safety Code] section 7100 right holder is the only express beneficiary of a contract for mortuary services, and that if the contracting party was not the [Health & Safety Code] section 7100 right holder, only the holder of that right may be seen as an intended beneficiary of the contract." (*Christensen,* at p. 882.) In a footnote, however, the court said, "Our conclusions here regarding the nature of contracts for mortuary and crematory services may be inconsistent with those of the Court of Appeal on this point." (*Id.* at p. 882, fn. 11.)

Despite this commentary, based on our high court's more recent clarification of the principles that determine whether a person or entity is a

third party beneficiary to a contract in *Goonewardene*, *supra*, 6 Cal.5th at page 828, we conclude that Edna and the extended family are not third party beneficiaries to Celina's contract with Community. Permitting them to bring a breach of contract action would be inconsistent "with the objectives of the contract and the reasonable expectations of the contracting parties." (*Id*. at p. 832.) This requirement for establishing third party beneficiary status "calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals, rather than a determination whether the parties actually anticipated third party enforcement at the time the contract was entered into." (*Id*. at p. 831.) In the case of contracts for funeral services, such as the one at issue here, we do not believe third party enforcement by those who expected to benefit from the services, even if limited to close family members, is a reasonable expectation of the contracting parties.

As discussed, it has been settled for 35 years that contracts for funeral services result in a special relationship between the provider and close family members of the decedent who are aware of the death and the funeral services. Pursuant to this relationship, close family members are already entitled to recover damages for severe emotional distress if they establish negligence on the part of the provider. (*Christensen*, *supra*, 54 Cal.3d at pp. 890–891.) Permitting family members to sue, *in addition*, for breach of contract will expand the scope of liability for providers in a way we believe to be inconsistent with reasonable expectations under most circumstances, including the circumstances present here. This is because, unlike liability in negligence, liability for breach of contract requires no showing of fault or scienter. It is one thing to permit recovery for emotional distress damages to a party to a funeral services contract upon a mere breach of contract, and no

38

showing of negligence. But it would be quite something else, and not reasonable, to permit recovery by potentially very large groups of family members without a showing of fault or intentional misconduct of some kind by the provider.

An expansion would also allow non-contracting parties to sue for sundry other perceived contractual breaches unrelated to severe emotional distress arising from the mishandling of a loved one's remains. We do not believe parties to these types of contracts expect to face enforcement from anyone but the contracting party in response to perceived problems with parking, caterers, flowers and similar contractual obligations typical under these types of contracts.

For all these reasons, we conclude that Edna and the extended family cannot establish that permitting them to bring a lawsuit to enforce an alleged breach by Community and Dolores of their obligations under their contract with Celina is reasonably consistent with the expectations of the contracting parties. The trial court's decision to dismiss Edna's and the extended family's cause of action for breach of contract is therefore affirmed.

## DISPOSITION

Judgment on the breach of contract cause of action is reversed and remanded as to Celina only. On remand, the trial court must make an independent decision on Dolores and Community's impracticability defense. In making its determination, the court may use the evidence presented at the original trial, together with such additional evidence as it may deem necessary and advisable. If Dolores and Community fail to sustain their burden of proof as to the defense, the court is directed to try the question of damages on the breach of contract cause of action, and to submit the question to a jury at the request of either party.

39

Costs on appeal are awarded to Celina with respect to her appeal. Costs on appeal are awarded to Dolores and Community with respect to the appeal by Ricardo, Jose, Sr., Querubeck, Jasmin, and Isack.  (Cal. Rules of Court, rule 8.278(a)(3).)


                                                           DO, Acting P. J.

WE CONCUR:


BUCHANAN, J.


KELETY, J.